GALVESTON, HARRISBURG & SAN ANTONIO RAILWAY COMPANY v. OLLIE M. GILLESPIE.

Decided December 4, 1907.

**1.—Railroads—Defective Track—Negligence.**

In a suit against a railroad company for the death of an engineer caused by his engine leaving the track on a curve, evidence considered, and held sufficient to require the court to submit to the jury the issue of negligence on the part of the defendant in permitting the rails on the curve to become worn and dangerous, and also sufficient to support the finding of the jury that the defendant was guilty of negligence in said respect, and that the deceased was not guilty of contributory negligence in violating the rules of the company concerning the speed of trains at said point.

**2.—Expert Testimony—Effect.**

A jury is not always bound to accept the conclusions of expert witnesses when the facts on which the witnesses base their conclusions are in evidence, even though the experts agree in their conclusions.    Expert testimony may be discredited by circumstances, as other testimony.

**3.—Charge—Invited Error.**

An appellant can not complain of an error in the main charge of the court when the same error is embodied in a special charge given at appellant's request.

**4.—Action for Death—Minors—Judgment Conclusive.**

Under the statute of this State a judgment rendered in a suit brought by a surviving wife in her own behalf and in behalf of her minor children

against a railroad for damages for the death of the husband and father, is conclusive against all the parties, including the minors.

### 5.—Negligence vel non—Circumstantial Evidence.

In a suit against a railroad company for damages for the death of an engineer, his watch, showing the time at which the wreck occurred and the watch stopped, was material evidence, in connection with other evidence, on the question of the speed at which the engine was being driven when the wreck occurred, because tending to show the time which elapsed between passing the last station and arriving at the place of the wreck.

### 6.—Contributory Negligence—Irrelevant Evidence.

The issue being whether or not an engineer was running his engine at a rate of speed in excess of that prescribed by the rules of the defendant company at the time of the wreck which caused his death, evidence that the deceased had been disciplined by the company a short time before for violation of a different rule, was not competent evidence.

Appeal from the District Court of El Paso County. Tried below before Hon. J. M. Goggin.

*Baker, Botts, Parker & Garwood* and *Beall & Kemp,* for appellant.—The violation by an employe of a rule designed for his protection without circumstances creating an emergency that will excuse it, will preclude a recovery by him when it appears from the undisputed evidence that the injury was caused in whole or in part by the violation. San Antonio & A. P. Ry. v. Wallace, 76 Texas, 636; Galveston, H. & S. A. Ry. v. Brown, 63 S. W. Rep., 305; Hynson v. St. L. S. W. Ry., 39 Texas Civ. App., 39; Missouri, K. & T. Ry. v. Keefe, 37 Texas Civ. App., 588; Southern Pac. Co. v. Pool, 160 U. S., 441; Louisville & N. Ry. v. Markee, 103 Ala., 162; McGrath v. N. Y. & N. E. Ry., 22 Atl. Rep., 927; Louisville, E. & St. L. Ry. v. Hanning, 31 N. E. Rep., 187; Stevens v. San Francisco & N. P. Co., 35 Pac. Rep., 165; Crane v. C. M. & St. P. Ry., 67 N. W. Rep., 1132; Lumpkin v. Southern Ry., 24 S. E. Rep., 963; Davis v. Nuttallsburg Coal Co., 12 S. E., Rep., 539; Richmond & D. Ry. v. Pannill, 89 Va., 552.

The charge is erroneous, in this, that it imposes the burden on the railway company "to furnish rails in a reasonably safe condition for the operation of its engines and trains;" whereas, the law imposes the duty on the defendant railway company only to exercise ordinary care to furnish rails in a reasonably safe condition for the operation of its engine and trains thereon. Texas & P. Ry. v. McCoy, 90 Texas, 265; Houston E. & W. T. Ry. v. Richards, 20 Texas Civ. App., 205.

The charge is erroneous, and prejudicial to the defendant, in this, that if plaintiff Ollie Gillespie could recover, then said Frank Gillespie, being a minor at the time of the death of his father, was entitled to recover without other proof of pecuniary loss sustained than that disclosed by the evidence, and the defendant in this case is not protected against another suit by said Frank Gillespie, as he is not bound by this judgment rendered against him. Houston & T. C. Ry. Co. v. Moore, 49 Texas, 31; Ft. Worth & D. C. Ry. Co. v. Wilson, 85 Texas, 516; Dallas & Wichita Ry. Co. v. Spiker,

59 Texas, 435; Dallas Rapid Transit Co. v. Elliott, 7 Texas Civ. App., 220.

*Beauregard Bryan* and *R. V. Bowden,* for appellee.

JAMES, Chief Justice.—The action was brought by Ollie M. Gillespie for damages in reference to the death of her husband, Wm. H. Gillespie, which occurred about two miles west of the station of Finley, at a curve in defendant's track, by reason of the engine which he was operating leaving the track. Plaintiff sued for herself and the two minor sons of Gillespie.

The court's charge states the pleadings correctly and substantially as follows:

"Plaintiff alleges that the said William H. Gillespie, her husband, was on or about the 2d day of February, 1904, engaged in the employ of the defendant railway company as locomotive engineer.

"That on said date in pursuance of his employment as such locomotive engineer he was operating one of the defendant's locomotives under the orders of the defendant company, and when he reached a point about three miles west of the station of Finley on the defendant's railway line said engine which said Gillespie was running suddenly left the track and was badly wrecked and the said William H. Gillespie killed. That said wreck occurred upon a curve and the engine went off said track as it was rounding said curve; that at the place where the said engine left the track and was wrecked, the track had become defective and in bad repair, in that the inside ball of what is known as the outside rail of the curve had become worn to such an extent as to render it dangerous for locomotives to run thereon.

"That the permitting of said rails to become so defective and ball worn was negligence on the part of the defendant company, and such negligence was the proximate cause of the said engine leaving the said track and becoming wrecked and said Gillespie's death, and that the said Gillespie himself was guilty of no negligence contributing to cause the derailment of the said engine or his said injury and death.

"The defendant company answers by a general denial, and specially answering says: that if Gillespie was killed by his engine being derailed, his death was not caused by any negligence or want of care on the part of the defendant, but was caused by the negligence of the said William H. Gillespie himself, who was at the time in charge of and operating the said engine.

"That at the time the said William H. Gillespie's engine left said track and he sustained said injury causing his death he was running his engine at a high rate of speed upon a sharp curve of more than six degrees, and at a speed in excess of the speed described by the rules of the defendant then in force. That the rules and bulletins of the defendant company then in force required that no freight trains in running around said curve should exceed a rate of eighteen miles an hour, and no passenger trains should

exceed twenty-four miles an hour in running around said curve, and that the said Gillespie was running said engine when injured at a high rate of speed in violation of said rules, and that he was guilty of contributory negligence in so running, and that such negligence was the proximate cause of the said engine leaving said track, and said Gillespie's death, and that the said Gillespie's negligence contributed to cause his said death."

The following issue was submitted as presenting the only ground of negligence of defendant authorizing a recovery:

"Now, if you believe from a preponderance of the evidence that at the place where said engine ran off and left the track and was wrecked, that the inside ball or balls of what is known as the outside rails or rail of the curve had become so badly worn and impaired as to render it dangerous for locomotives to run thereon, and that the permitting of said ball or balls of the rails or rail to become so worn and defective, if they did become so worn and defective, and not replacing same with new rails, was, under all the surrounding facts and circumstances, negligence, on the part of the defendant company, and that such negligence, if any, was the proximate cause of the said engine leaving said track and becoming wrecked, and of deceased's consequent death, and further believe from the evidence that the said deceased was not himself guilty of negligence contributing to cause such derailment and his injury and death, as that question is hereinafter submitted to you, then and in that event your verdict should be for the plaintiff, but if you do not so believe your verdict will be for the defendant company."

The remainder of the charge presented theories upon which defendant would have been entitled to a verdict.

There was a verdict for plaintiff in the sum of $5000 and for the son, Guy Gillespie, for $2000 and nothing for the son, Frank F. Gillespie.

The first assignment is that the court erred in refusing a peremptory charge for defendant, appellant submitting this to us upon four propositions:

1st. There was no evidence which warranted the court in submitting the issue that defendant did not exercise ordinary care in furnishing its engineer Gillespie with a reasonably safe track.

2d. The undisputed evidence shows that Gillespie, at the time of the derailment, was running on a curve of more than six degrees at a speed exceeding twenty-four miles an hour in violation of an established and absolute rule of the company.

3d. Said rule regulating engineers was designed for the protection of employees, as well as passengers, and the negligent act of decedent in violating same was so opposed to the dictates of common prudence as to establish, of itself, contributory negligence.

4th. The violation of such rule, without circumstances creating an emergency that will excuse it, will preclude a recovery, when it appears from the undisputed evidence that the injury in whole or in part was caused by the violation.

The following facts and circumstances were in evidence: Gillespie, on February 2, 1904, was running a light engine with tender, but without any cars, and was proceeding westward towards El Paso. The station of Finley had been passed, the distance to the place of the accident was about two miles—a witness made it two and one fourth—and stated it was "a little up grade about a mile and a half from Finley, then a little level place, then it starts down again (it was a one-half of one percent grade). The engine was going down this grade when the wreck occurred." The track was curved at the place, it being the maximum curve of ten degrees, which character of curve requires constant watching on the part of the company, and it was dangerous for the employee to run over it at a greater speed than the time limit for six degree curves or over. The rule in force at the time prescribed on curves over six degrees the limit of 18 miles for freight trains and 24 miles for passenger trains. A witness testified that Gillespie, running an engine and tender, was classed as running a passenger train.

No one witnessed the accident. Both Gillespie and his fireman were killed. It was in proof that when this engine passed Finley it was going at about twenty miles an hour at 12:27 o'clock in the daytime, that the watches of both Gillespie and his fireman were stopped at 12:35, and the distance between Finley and the curve in question was 2¼ miles, this making the rate of speed observed between the points in the neighborhood of 18 miles an hour. It was in proof also that the reverse lever of Gillespie's engine was, when found, fixed about the center notch, which had the effect of shutting off steam, and admitting of motion of the engine only by momentum. The evidence showed that Gillespie had been promoted to engineer in April, 1903, and was a good man, sober and industrious. There was nothing unusual in his appearance or conduct when last observed.

The evidence showed that the life of a T rail of 61½ pounds, with which this curve was laid, was three or four years, according to whether the traffic was light or heavy, · and they were renewed that often. The traffic was heavy and getting heavier all the time. In this instance the rails had been down about three years. The tendency of use on the ball of the outer rail, which was elevated, was to wear it off on the inside, which would widen the gauge and cause the wheels there to ride the rail, and give them a tendency to leave the track. Defendant's witness, Tanheuser, testified as follows: "So the tendency would be to render easier the derailment on the inside curves the more play you give it to go on the outside? Ans.: No, sir, it would have a tendency to climb over the outside rail more than the inside rail to drop in. Q. The tendency would be to cause it to ride the rail rather than drop off the inside rail? Ans.: Yes, sir. Q. But it would have a tendency to make derailment easier when it has more play? Ans. Yes, sir."

The rails at the place of the accident were not produced, but had been disposed ·of by defendant as scrap iron. Another worn rail was used at the trial for purposes of illustration, and the effect or extent of the testimony of witnesses upon this feature of the case

was that the ball of the outer rail, where this derailment occurred, had worn off something like one fourth of an inch, some of the testimony was five sixteenths of an inch.    Defendant's witnesses testified that such a rail on such a curve would be a safe piece of rail to operate on, meaning if the proper speed was observed, and that a rail becomes dangerous when it is worn half an inch and they are then removed.    The roadmaster had warned employees that the track at this place was dangerous.

Defendant's witness testified, from seeing the wreck and the existing conditions, that it had the appearance of the engine and tender going off the track at a speed of from forty to fifty miles, one witness stated sixty miles, an hour.    It appeared, however, that a freight train of twenty-nine cars, which closely followed Gillespie's engine, arrived at the curve at 12:55 o'clock, going at the rate allowed for freight trains, and the engineer, on perceiving that a rail in the curve ahead of him had been displaced, applied the air, went off the track and was wrecked.    Several of the cars of this train were injured, and the engine, though it remained standing, reached a point and stood, according to one witness, about seven or eight feet from where Gillespie's engine was found.

It appears that several hours after these wrecks S. F. Hawks, division superintendent; E. H. Tanheuser, resident engineer; P. E. Kelly, roadmaster; H. C. Borcherding, foreman of car repairers, and Samuel Marks, superintendent of the El Paso Division, repaired to the scene and proceeded, with others, to look at the situation and ascertain the cause of the wreck.    All of said persons testified to the conditions they found, qualified themselves as experts and gave it as their conclusion that excessive speed was the cause of Gillespie's derailment, Marks testifying that he must have been going over fifty miles an hour.    Hawks, Tanheuser and Kelly said the same.    Borcherding said between fifty and sixty miles an hour.    It appears from their testimony that after they got there and examined the rails and saw the conditions all said persons considered and discussed the matter and agreed that the engine was running not less than fifty miles an hour.    Defendant's witness, Ross, who at the time of the wreck was its superintendent of bridges and buildings, also went to the wreck and testified that very little examination could be done, as the track was torn up and littered with cars and the ground was covered with cars, but it looked to him that fast running had caused the derailment, he thought fifty miles, it might have been sixty.    Witness was there with the above named person and others, who looked the situation over to find the cause of the wreck.    He says they passed their different opinions, and, after talking it over, they agreed upon not less than fifty miles an hour.

These expert witnesses differed as to how far the engine was found from the place it left the rails, or how many times it had turned over.    Marks stated that it was 60 feet from where the engine left the track to the place it left the rail, and that it was found about 300 feet from the point of derailment.    Ross said it was possibly 300 feet from where the track was torn up.    Marks

stated that from where he noticed the marks on the rail where the engine left the track to where it was lying was about 180 feet. Borcherding stated that the engine that Gillespie was killed on was lying about 150 or 170 feet from where the engine left the rail. Hawks stated from where it appeared to have left the track to where it finally landed was about 180 feet. Tanheuser stated about 200 feet from where the first marks were on the track. Some testified that the engine had, from appearances, turned over once, one and a half times, others two and two and a half times. Marks testified that whether or not the engine would turn over would depend on whether it had gotten off the ties or not. He could not say, running at 18 miles an hour, whether it would have gotten off the ties or not. That nobody could tell whether running at 18 or 25 miles an hour an engine would go off that curve. That he could not state at what speed it would have to be going to turn over just once. Tanheuser did not believe the engine would have turned over at all running at 18 miles an hour, or even at 25 miles an hour. At 30 miles it might have turned over on one side. That to make two turns he did not know how fast it would have to be going. That it took 40 miles an hour to throw an engine on its back. McCamant, conductor of the other wrecked train, testified that the indications were that the engine turned over only once. That from the situation down there, tracks, engine, lay of the land and everything, he could not tell at what speed the engine was going when it went off the track. Drodge, division master mechanic at that time, stated it turned over once. Borcherding stated that running at thirty miles the engine would not have turned over; that it turned over once and a half and must have been going pretty fast. Drodge stated that he was reasonably sure it was going over twenty miles an hour, and not sure that it was going over thirty, although it was his belief that it must have been between 40 and 50 miles.

We are of the opinion: First. That the testimony was sufficient to warrant finding that the rail had become worn on this curve to such an extent as made it liable to derail an engine going at the rate of speed permitted this engine by the rule, and that defendant had failed to exercise ordinary care in having it in that condition for the use of its servants. Defendant's witnesses brought the wearing off of the rail to near the point of danger. It had been in use for the length of time such rails could with safety be used, in view of the testimony of the increasing heavy traffic over the road, of the fact that the tendency of the ball wearing off was to make derailment easier, and that the roadmaster, Kelly, had warned employees that its condition was dangerous.

Second. That while the consensus of opinion expressed by the expert witnesses is strongly in favor of the theory that Gillespie was allowing the engine to run so much in excess of the prescribed speed, that his conduct was reckless and was responsible for his death, yet there were circumstances which seem to us might prevail to the contrary. He was shown, when last seen, to have not been in any condition that was indicative of anything but a careful

person; that he had just observed a time limit of eighteen miles an hour in traversing the distance between Finley and the place of the disaster, which, while it would not show that he was not going at a higher speed than 24 miles an hour at the moment of the derailment, does tend to show that his disposition, while making that run, was that of a careful person, and it would be an admissible inference that this did not suddenly change at least to such an abnormal extent as is indicated by the testimony of defendant's witnesses. In addition to that, the reverse lever of his engine was set so as to show that he had the steam shut off, which indicated the exercise of care. These circumstances the jury was entitled to consider, especially when the testimony of excessive speed was by expert witnesses, who, while they agree in their conclusions as to excessive speed, did not support each other as to the facts upon which they founded their conclusions. For example, if the engine turned over only once, as two of them testified, what effect would this have upon the testimony of those witnesses who stated that the speed was fifty miles an hour, which was based in part upon the fact that it turned over twice or two and a half times? Again, the distance the engine went from the point of derailment was a subject of a material difference in the testimony of these expert witnesses, and the judgment of those, who formed any idea of its speed by considering the distance of 300 feet, would not be of much reliability if the jury believed the witnesses who testified that the distance was much less. Although there was unanimity in the opinion formed of the speed at which the engine must have been moving, there was a want of unanimity as to the conditions on the ground from which the estimate of speed was formed. The witness, McCamant, who had been in the railroad service twenty years as brakeman and conductor, and had seen a good many wrecks, admitted that he could not tell at what speed the engine was going when it left the track, from what he saw there, the tracks, the engine lying on the ground, the lay of the land and everything. Save that when McCamant's train went off, the far end of the rail was loose and his engine went through it, instead of over the rail, there was no explanation of the fact, except what the jury could make out of it, that his engine which was moving at only 18 or 19 miles an hour (which was less than Gillespie was allowed to run) with the air applied and with a number of cars attached, landed within a few feet of where Gillespie's engine was found lying.

We conclude that there was no error in submitting the case to the jury, both as to defendant's negligence and Gillespie's contributory negligence. No one testified from having witnessed the speed that Gillespie was making. The testimony of witnesses as to the speed was that of experts, which character of evidence the jury is not always compelled to adopt as their own conclusions, particularly when they have the very facts before them upon which the experts say they formed them. In such a case the jury are supposed to be able to form their own conclusions, rejecting the others, if their judgment is to the contrary. Here the experts concur on

a high rate of speed, each one giving the facts and conditions upon which he bases it, and they differ materially on what the jury might think are conditions material to the conclusion. Expert testimony may be discredited as any other testimony. Sabine & E. T. Ry. v. Hadnot, 67 Texas, 505; Galveston, H. & H. Ry. v. Bohan, 47 S. W. Rep., 1053; Kennedy v. Upshaw, 66 Texas, 442; Rapalje on Witnesses, sec. 300; Head v. Hargrave, 105 U. S., 45. The jury could properly in this case have found, as they must have done, under the charge and from their verdict, that Gillespie was not guilty of negligence on this occasion.

The second assignment complains of the seventh paragraph of the charge, which told the jury that if they believed Gillespie was running fifty or sixty miles an hour at the time the engine left the track, and that such running was in excess of the speed allowed on such curves by the company's rules and proximately contributed to cause the engine to leave the track, to find for defendant. The proposition is, "If Gillespie was running his engine at a greater rate of speed than 24 miles an hour, he was guilty of contributory negligence." The only possible ground for a claim of error on the instruction is its requiring the jury to find more than the fact of such excessive speed. That the charge is not erroneous, as misstating the law in what it states about the speed proximately contributing to cause the engine to leave the track, appears to be settled in Parks v. San Antonio Traction Co., 100 Texas, 222. Besides, defendant requested a charge which was given, and which was subject to the same objection and told the jury that if plaintiff failed to establish due care in the operation of the engine, and that such want of due care, if any, caused or contributed to plaintiff's injuries, to find for defendant.

The third assignment complains of the following paragraph of the charge: "Therefore if you believe from the evidence that the leaving of said track by said engine was not due to any negligence on the part of the railway company, if any, in failing, if it failed, to furnish rails in a reasonably safe condition for the operating of its engines and trains thereon, under its rules, but was due to a risk ordinarily incident to the business, then, and in that event, your verdict must be for the railway company, as he would have assumed the risk in that case." The proposition is that the above instruction is erroneous in imposing upon the defendant the duty to furnish rails in a reasonably safe condition for the operation of its trains and engines, when the duty is to exercise ordinary care to that end. The charge is clearly not subject to the objection.

The fourth is directed to this charge: "If you believe from the evidence that the said son, Frank Gillespie, sustained no pecuniary loss by reason of the death of his father, you should find nothing in his favor in any case, and if you find for defendant as to one or all of said plaintiffs, you will so state in your verdict."

This is claimed to have been prejudicial to defendant in that if Mrs. Gillespie could recover, then Frank, "being a minor at the time of his father's death, was entitled to recover without other

proof of pecuniary loss than that disclosed by the evidence, and the defendant in this case is not protected against another suit by Frank Gillespie, as he is not bound by the judgment against him." The evidence warranted the conclusion that deceased did not contribute toward the support of Frank, who was then between 18 and 20 years of age, and that he, therefore, sustained no pecuniary loss. It seems to us that the court could do no more or less than submit the issue. Plaintiff was authorized by the statute, which creates this form of liability, to bring the action on behalf of all interested in the claim. She was the statutory representative of the other parties, and the judgment entered in the action is conclusive upon all in favor of defendant except for fraud participated in by defendant. De Garcia v. San Antonio & A. P. Ry. Co., 90 S. W. Rep., 670.

There was no error in admitting in evidence Gillespie's watch. It is contended that the time when his watch stopped did not show, or tend to show, the rate of speed at which he was going at the time of the derailment. While the time indicated by the watch at which the train went off, did not show the rate at which he was then going, it was material, in view of the time at which he passed Finley and the distance between the two points, as showing the speed he had observed in going from Finley to this curve, and this was, as we have already stated, a circumstance entitled to be considered upon his probable conduct, or disposition in respect to care or recklessness, at the time of the derailment, along with other circumstances. The fifth assignment, to which the above remarks refer, was simply that the court erred in admitting Gillespie's watch in evidence, as not material to any issue in the case. It was shown that the watch was in the same condition as it was when found on Gillespie's person. Now, it seems that this assignment would not be permitted, in any event, to reverse the judgment, for the reason that the same testimony in respect to the fireman's watch went in without objection.

The sixth assignment is that the court erred in refusing to admit certain testimony from witness Marks, in substance, that Gillespie was on July 15, 1903, disciplined by an order from the superintendent for negligently running his train in a station at too great a rate of speed in violation of an order that engineers should have their engines under control coming into a station, and was laid off two months therefor. This testimony was not admissible. Missouri, K. & T. Ry. v. Johnson, 92 Texas, 382; Missouri, K. & T. Ry. v. Parrott, 43 Texas Civ. App., 325.

The other assignments of error are directed to the overruling of the motion for a new trial. If what is said in this opinion, in connection with the assignments already discussed, be correct, the remaining assignments must be overruled. Judgment affirmed.

*Affirmed.*

Writ of error refused.